# WHEELING.

## STATE *v.* GAUGHAN.

Submitted June 6, 1904—Decided June 9, 1904.

**1. INSTRUCTION.**

Upon the trial of an indictment under section 1, chapter 151, Code, for unlawfully keeping and exhibiting a gambling device commonly called a "slot machine," it is not error to instruct the jury that "if the jury shall believe from the evidence beyond a reasonable doubt, that the slot machine described in the indictment is a gaming table, and that the said machine is so constructed that it offers unequal chances to the player and exhibitor, and that the unequal chances are in favor of the exhibitor of said machine, then the said slot machine is a gaming table of like kind and character to A, B, C and E O table, faro bank and keno table." (p. 694).

Error to Circuit Court, Harrison County.

Frank Gaughan was convicted of exhibiting a gaming table, and brings error.

*Affirmed.*

M. G. SPERRY, CLARENCE B. SPERRY, JOHN BASSEL, and CORNWELL & CORNWELL, for plaintiff in error.

The ATTORNEY GENERAL and J. E. LAW, for defendant in error.

McWHORTER, JUDGE:

Frank Gaughan was indicted by the grand jury in the circuit court of Harrison county under section 1, chapter 151, Code. The indictment contained three counts. The defendant moved to quash the indictment and each count thereof, which motion, being argued by counsel and considered by the court, was, by consent of the prosecuting attorney for the State and the attorneys for the defendant, sustained as to the first and second counts of said indictment and the court overruled said motion as to the third count of said indictment; the said third count being as follows: "And the grand jurors, aforesaid, upon their oaths aforesaid, do further present, that Frank Gaughan, on the —————— day of July, 1902, and within twelve months, prior to the find-

ing of this indictment, in said county, at Clarksburg, did know-
ingly and unlawfully, exhibit a certain gaming table, common-
ly called a slot machine, being a table and machine of like kind
to A, B, C, and E O tables, and faro bank, wheel of fortune,
and keno tables, which machine is played by dropping coins
into the slot, as indicated by the machine, the coins used being
a nickel, a dime, and a quarter, or twenty-five cent piece, and
the games played on said machine, are games in which the
chances are unequal, all other things being equal, and those
unequal chances are in favor of the exhibitor, the said Frank
Gaughan, of the said gaming table, the said slot machine,
against the peace and dignity of the state." The defendant
then entered his plea of not guilty and a jury was empaneled
and sworn, and having heard the evidence, returned a verdict of
guilty against the defendant as charged in said third count of
the indictment. The defendant moved the court to set aside
the verdict on the grounds that the same was contrary to the
law and the evidence, and grant defendant a new trial, which
motion the court overruled and entered judgment for a fine of
$200.00, and that defendant be imprisoned in the jail of Har-
rison county for the period of three months, and that the state
recover the costs of her prosecution, to which judgment and
rulings of the court the defendant excepted, and obtained from
one of the judges of this Court a writ of error and *supersedeas.*

The facts admitted upon the trial of the case as well as all
the evidence for the prosecution and for the defendant, and
the instructions asked for and given on behalf of the state and
of the defendant, are set out in full in one bill of exceptions
taken by the defendant, and signed and made part of the record.
The instruction complained of as error, given for the state is
as follows: "The court further instructs the jury that if the
jury shall believe from the evidence, beyond a reasonable doubt,
that the slot machine described in the third count of the indict-
ment is a gaming table, and that the said machine is so con-
structed that its offers unequal chances to the player and exhibit-
or, and that the unequal chances are in favor of the exhibitor
of said machine, then the said slot machine is a gaming table
of like kind and character to A, B, C, E. O. table, faro bank and
keno table." · The giving of this instruction, and overruling

the motion to set aside the verdict and grant the defendant a new trial, are the only errors assigned by the defendant.

It is contended by counsel that this instruction places an erroneous definition upon the words "a table of like kind as being any machine 'so constructed as it offers unequal chances to the player and exhibitor,' " that there is no statute in this state forbidding the operation of slot machines. The instruction is within the rule laid down in *Wyatt's Case*. 6 Rand. 694, and *Huff's Case*, 14 Grat 648, where it is held, "The distinctive feature in the character of the games called 'A, B, C' and 'E O' and 'faro bank,' is that the chances of the games are unequal, all other things being equal, and those unequal chances are in favor of the exhibitor of the games or tables." These decisions of the court of appeals of Virginia are under our Constitution and laws binding upon this Court, and we cannot hold inconsistently therewith unless we deliberately determine to overrule that which has been the law since long before the creation of the State of West Virginia. But it is insisted that the offense in the *Wyatt Case* was a *"Banking game."* We think the slot machine is essentially a banking game. When the player wins, if it happens that he does win, the money is paid from the machine, the bank fund, the deposits of the previous and less fortunate players. It is played by the machine or the exhibitor on the one side, and any and all players who choose to play on the other side and the chances to win are unequal with the greater number of chances in favor of the machine or exhibitors. These are undisputed facts. It is contended that section 1, chapter 151, is only intended to affect large gambling, where large sums may be won and lost. The statute is clear and explicit. It makes no distinction in said section, whether a nickel or a thousand dollars is risked in the venture, the principle is the same, and the statute is intended to suppress it.

Counsel for defendant say that "the legislature which met in this State in 1897 and 1899 had bills before them making the keeping or exhibiting of a slot machine in this State, an offense and prescribing a penalty commensurate with the act—facts which tend to show at least that the members of the legislatures which met in those years did not think that section 1, of chapter 151, embraced or included the slot machine." If this fact bears upon the question at all, it tends to show that

the legislature was satisfied that the statute was already sufficient to suppress all the specific tables mentioned in section 1, and tables of like kind, including the slot machine, hence, further legislation was deemed unnecessary especially in view of the construction placed upon the statute by the Virginia Court of Appeals.

The Honorable John W. Mason, judge of the circuit court of Harrison county, has so ably discussed this subject in a charge delivered by him to a grand jury of said county, and incorporated in the brief of counsel for the state in this case, that I here adopt his language:

"Whether or not a person exhibiting or using a slot machine may be punished under the laws of this State prohibiting gambling depends wholly upon the fact of whether or not a slot machine is a gambling device. The exhibition or use of slot machines is not specifically prohibited by name in any statute. If prohibited at all, it is because they come within the terms, intent and meaning of the statutes as 'tables of like kind' with those specified in the statute. If the use of slot machines, as they are used, is in fact a game, and being a game, is of such character, as may properly and legally be said to be a game of like kind with the prohibited games named, within the true intent and meaning of the statute creating and defining the offense, then, the power and duty of the courts to punish the keeper or exhibitor of such machines is precisely the same as though the name 'slot machines' was written in the statute. We must therefore look to the statute in relation to offenses of this character, and give to the statute the correct interpretation.

"Chapter 151 of the Code fully covers and includes all gaming and gaming devices, so far as the legislature deemed it expedient to legislate upon the subject. Section one of this chapter provides that 'a person who shall keep or exhibit a gaming table commonly called A, B, C or E O table, or faro bank, or keno table or table of like kind under any denomination, whether the game or table be played with cards, dice or otherwise or shall be a partner or concerned in interest in the keeping or exhibiting such table or bank shall be confined in jail not less than two nor more than twelve months, and be fined not less than one hundred nor more than one thousand dollars. Any such table or faro bank, and all money staked or exhibited to allure persons to

bet at such table may be seized by order of a court or under the warrant of a justice,' etc. The other sections of this chapter provide penalties for various forms of gambling. There is no difficulty in executing this law and enforcing the penalties as to the game specified. The trouble is to determine what games properly come within the meaning of the 'tables of like kind' with those named. The statute expressly provides that these tables of 'like kind' may be of any denomination, and that the game or table may be played with cards, dice or otherwise. That is to say, if there be a table used in connection with and as part of the game, it may be played with cards, dice or otherwise, or the game itself may be played with cards, dice or otherwise, and if so played as to make it of like kind with the games prohibited, it is a violation of said section. What then is meant by tables of 'like kind,' as used in this section? Is it absolutely necessary that there shall be a real table, or are the games named intended to point out certain forms of gambling and include all games of that particular form and character? I am clearly of opinion that the legislature intended to forbid certain kinds of gaming, among which are faro banks and keno tables, and all other games like them. It makes no difference, in my judgment, whether these games are played with or without a table—on a table or under it; or rather it may be affirmed that anything on or by means of which such games are played, is a table within the meaning of this statute. We must look to the game itself and not the name by which it is called, or the instruments with which, nor the thing in or on which it is played, to determine whether or not the game is unlawful. We must not lose sight of the spirit and intent of the law. There is an old Latin maxim which says *'Que haeret in litera haeret in cortice,'* which somewhat liberally translated means, he who considers merely the letter of an instrument, goes but skin deep into its meaning. The law respects the effect and substance of the matter and not any nicety of form. When the intention is clear too minute stress should not be laid on the strict and precise signification of words. The meaning of particular words in statutes is to be found, not so much in a strict etymological propriety, nor even in popular use, as in the subject or occasion in which they are used, and the object that is intended to be attained. Brown's Leg. Maxims, side pages, 435, 436 and 437. 'Narrow and techni-

cal reasoning should never be resorted to by courts to prevent a statute having the force and effect plainly intended by the legislature, but, on the contrary, when courts know the reason which alone determine the will of the law makers, they ought to interpret and apply the words used, in a manner suitable and consistent to that reason, as will be best calculated to affect the intent.' Of course great caution should be exercised by the courts in applying this rule to be certain that they know and have ascertained the true reason, which induced the law-making power to make the law. See Cooley on Constitutional Limitations, chapter 4. Statutes providing for the punishment of offenses should be construed strictly, but they should be so construed as to give force and effect to the clear intent of the act. Courts should not so construe any statute as to furnish holes through which the guilty may escape, unless unavoidable.

"Our legislature has not deemed it necessary to prohibit all forms of gaming. Many games may be played in private places provided the betting does not exceed $20, and other games out of regard for the sentiments of some people to whom such games are offensive, may not be played in public places. But no game of unequal chances can be played anywhere lawfully. The legislature has, in effect, said that people may indulge in certain games of amusement, or even bet on them to a limited extent, but that no person shall cheat his companion in the game by insisting on playing a game wherein the chances for winning are all on his side. History and tradition informs us that our Virginia ancestors were not wholly free from the vice of gambling, but they had a supreme contempt for the coward who would not 'play' without a guaranteed advantage, making it certain that he would win oftener than he would lose. Looking then to the history of our gaming laws as well as to the statute itself, let us see what is a proper construction of section one, of chapter 151, of our Code. The games prohibited by this chapter—and indeed all unlawful gaming—may be divided into two classes. To the first class belong the games wherein the chances are equal. To the second class belong the games wherein the chances are unequal, all other things being equal, the unequal chances being in favor of the keeper or exhibitor of the game. The games falling under the second class are enumerated in the statute as 'A, B, C, E O, and keno tables and faro banks, and

tables of like kind.' If the words 'slot machines' were inserted in the statutes and their use prohibited, very soon they would be supplanted by other machines bearing a different name, differing in form and construction; omitting the word 'slot,' but retaining all the objectional features of the old machine. But according to certain strict constructionists such new devices would not be 'slot machines' without the regulation 'slot' into which the player's money would disappear. The statutes could not be amended often enough to meet such cases unless the legislature were in session continuously. I respectfully, but most earnestly, protest against all such rules of construction. It is absolutely impossible for the legislature to name all games specifically. The names and devices are continually changing. Hence in section one of this chapter the legislature named four games. They were selected as the representatives of a class. They are the standards by which the criminal character of other games is to be determined. All other games, when tested by these standards, and found to be of like kind with them, are prohibited by this section just as effectually as though they were named in the statutes.

"In order then to ascertain what games not named in section one of this chapter were intended to be prohibited, we must determine in what respect the games not named must be like the games named—to bring them within the terms and meaning of the statute, of what must the likeness consist? The four games named are all games of unequal chances, and the unequal chances are in favor of the keeper or exhibitor of the games. The skill of the player, or his luck, cannot effect the general result of the game. From the very nature and character of these games, the keeper or exhibitor will win oftener than the player. This I understand to be the distinctive character of these four games, and that all other games possessing this distinctive feature are games of like kind with them, within the meaning of this statute. This is the construction which has always been given to this section by the courts of Virginia and West Virginia. This law has been in force for many years in both states. We find it in the Code of 1819, chapter 147, sections 17 and 18, except that keno tables were added by our Code of 1868. The first construction that we find of this section made by an appellate court is *Wyatt's Case,* 6 Ran. 693. In

that case the general court, in a very elaborate and able opinion, delivered by Judge Daniels, held that 'the distinctive feature in the character of the games called A, B, C, and E O and faro bank is that the chances of the game are unequal, all other things being equal, and those unequal chances are in favor of the exhibitor of the games or tables. If other games resemble those standard games in that distinctive feature they come within the terms of the 17th section of the gaming act, being gaming tables of the same or like kind, and are liable to the penalties denounced against those standard games whatever may be the enumeration of those other games, and whether played with cards, dice or in any other manner.' Wyatt was indicted for keeping and exhibiting a gaming table called 'Haphazard,' alias 'Blind Hazard,' alias 'Smickup,' alias 'Sweat.' The game was played with cards; the deck game cut into parcels, and the parcels placed on a table with the faces of the cards down; the betting done on the denomination of the bottom card of the parcel selected by the player. The game was so played that the dealer had unequal chances for winning, and this game so played, with cards alone, was held to be a game of like kind with a faro bank, within the meaning of the statute, for the plain reason that the distinctive features of the games were alike—both were games of unequal chances, and the unequal chances in favor of the keeper of the game. This case was decided in 1828, and has been followed by all the courts of Virginia and West Virginia, so far as I am aware. I refer to *Huff's Case,* 14 Grat. 642, and *Nuckoll's Case,* 32 Grat. 884. In *Huff's Case,* 14 Grat. 648, the contest was over the sufficiency of the indictment—whether the allegation of the indictment were sufficient to bring the case within section 1, chapter 198, (now chapter 151) and the court held that the indictment must show by averments that the gaming charged is of the like kind as those specified, that is, that the chances of the game are unequal, all other things being equal.' This case was decided in 1858. In *Nuckoll's Case,* 32 Grat. 834, the court says: 'In regard to what is a table of like kind with those specified in the statute, according to its true intent and meaning, there are two decisions of this court, which seem to settle the matter beyond all controversey.' The cases referred to are the Wyatt and the Huff cases. The *Nuckoll's Case* was decided in 1879, about fifty-one years

after the *Wyatt Case* was decided, and so after a half century had passed, during which time it had been the unquestioned law of the State, it was again approved by the Supreme Court. It has been the recognized law of this State for three quarters of a century and does seem to me that it should be considered as settled.

"I may now venture to address a few words to these decisions. The word 'like' is not a precise term. We often say that a certain thing is like a certain other thing, and use the term correctly when in fact the two things are quite unlike in many particulars. In such cases we have reference to some peculiar feature or distinctive character in which they are alike and in this sense they may properly be said to be alike, no matter how widely they may differ in non-essentials. Many illustrations will occur to you. The distinctive feature of certain liquors is that they are intoxicating. All liquors containing sufficient alcohol are intoxicating, and are therefore in this particular the same, or of like kind, whether they are called whiskey, brandy, gin, rum, or any other name, and notwithsstanding these liquors may differ widely in taste and in other respects still they are drinks of like nature. And I conclude that one game to be like another need not be played with the same things, in the same manner, with same kind of machinery, called by the same name, with or on the same kind of a table; it is sufficient if they are alike in their distinctive features and character. In *Wyatt's Case* before referred to, the cards might just as well have been placed on the floor, on a chair or his lap or on the ground, as on a table. He was convicted, not because he played cards on a table, but because he kept and exhibited a game wherein the chances were unequal and the unequal chances were in his favor. The offense consisted in the kind of game he was playing with the cards, and not the place where the cards were deposited. The table was not part of the game. I may add that *Wyatt's Case* was carefully and fully examined by a very able court, composed of some of the most learned and distinguished judges of Virginia. It may have been regarded by them, as possessing some elements of hardship. Wyatt evidently did not realize the magnitude of his offense. The verdict of the jury was: 'We, the jury, find the defendant guilty, but ignorantly so, he not knowing at the time that the law embraced this case—and do therefore rec-

ommend him to the mercy of the court,' and then the penalty
was unusually severe. He might under the law then in force,
have been imprisoned in jail not less than one nor more than
six months, at the discrimination of the court, 'and be kept there-
on low and course diet as prescribed by law for convicts in the
penitentiary,' and in addition thereto 'be punished with stripes.
at the discretion of the court, to be inflicted at one time or at
different times during such confinement, as the court may direct,.
provided the same do not exceed thirty-nine stripes at any one
time.' Session Acts of 1822, chapter 32, section 4. Wyatt might
thus have been imprisoned six months and whipped any day of
his imprisonment, provided only the stripes did not exceed
'forty, less one,' at any one time. Notwithstanding this harsh-
penalty, and I may add without unduly criticising our ancient
law givers, the penalty was cruel and inhuman—and notwith--
standing the further fact that Wyatt violated the law ignorantly,
yet that court, composed as it was at the time this case was-
heard of such men as Judges Brockenborough, Daniels, Parker,.
Upshur, and others, acquisced in this conviction, and gave to-
the statute a construction which made his conviction legal.
The courts and juries of that day seem to have asked themselves.
but one question: 'What is the law?' It is well that courts and
juries of this day follow their example. We should always bear
in mind that the legislature makes the laws and that it is the-
duty of the courts simply to construe and enforce them."

There is no error in the judgment and the same is affirmed.

*Affirmed.*


BRANNON, JUDGE, (*concurring*):

In 1828 fifteen Virginia judges, composing the General Court,.
construed the statute now before us. *Wyatt's Case*, 6 Rand. 694.
As I understand the decision, that court held that *the distinc--
tive feature"* in the character of the games condemned by the
statute is "that the chances are unequal, all other things being
equal, and those unequal chances are in favor of the exhibitor of
the games, or tables;" in other words, held that if that one dis--
tinctive feature be present in the game, no matter what called or-
how played, though in other respects there be no inequality be--
tween the parties, the game will fall under the statute. That fea--

702 STATE v. GAUGHAN. [55

ture of inequality is present in the operation of the slot machine, and there is no other feature in it to repel or neutralize that feature, even if it could do so, that one feature being present. The court of appeals of Virginia in 1858 understood *Wyatt's Case* as so construing the statute, as that court held that if an indictment charged that the gaming "is of the like kind as those specified; that is, that the chances of the game are unequal, all other things being equal," it charged an offense under the statute. *Huff's Case,* 14 Grat. 648. In 1879 the Virginia court of appeals regarded the two prior cases as thus settling the construction of the statute, because it said, in stating the meaning of *Wyatt's Case,* that "if other games resemble those standard ones in that *distinctive feature,* they come within the terms" of the statute. *Nuckolls Case,* 32 Grat. on page 895. After much consideration I conclude that those decisions settle the case before us. They bind us. I do not think that any better solution of the words "or table of like kind," can be found. Though the slot machine plays for only a nickel, it plays for many of them, and amount is not made a test under the statute, and we cannot introduce an exception. It is true that criminal statutes are to be construed and applied strictly, but we must think of the evil against which the Legislature aimed. Its aim was to prohibit all sorts of gaming of uneven, unfair chance.

It specified "A, B, C, or E O table or faro bank, or keno table," and reflecting that there were then and would in the future come other games, it added "or tables of like kind, under any denomination, whether the game or table be played with cards, dice or otherwise." A "table" is not essential to make the game come under the law, since we see the word "game" also used. We must not give the law a construction too narrow under such broad language, and defeat plain, comprehensive intention of the Legislature. It strengthens our decision to add that the Code requires us not to construe this statute strictly as a penal statute. It says, "All laws for suppressing lotteries and unchartered banks shall be construed as remedial." Chapter 151, paragraph 16.