438 S.E.2d 308

STATE of West Virginia ex rel. MOUN-
TAINEER PARK, INC., A West Vir-
ginia Corporation, Petitioner,

v.

Charles POLAN, Secretary of the Depart-
ment of Administration of the State of
West Virginia, and Ronald Riley, Di-
rector of the Purchasing Division of the
Department of Administration of the
State of West Virginia, Both in Their
Official Capacities Only, Respondents.

STATE of West Virginia ex rel. The
WEST VIRGINIA STATE LOTTERY
COMMISSION, Petitioner,

v.

Charles POLAN, Secretary of the Depart-
ment of Administration of the State of
West Virginia, and Ronald Riley, Di-
rector of the Purchasing Division of the
Department of Administration of the
State of West Virginia, Both in Their
Official Capacities Only, Respondents.

Nos. 21767, 21768.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 14, 1993.

Decided Oct. 28, 1993.

(hereinafter "Mountaineer") and the West Virginia Lottery Commission (hereinafter "Lottery Commission"), each seek a writ from this Court to compel the respondents, Charles M. Polan and Ron Riley, to approve a contract entered into between the petitioners for the operation of an electronic video lottery game. For the reasons stated herein, we deny both writs.

John L. McClaugherty, Louis S. Southworth, II, Wendell Turner, Jackson & Kelly, Charleston, for petitioner, Mountaineer Park, Inc.

Robin Welch, Sp. Asst. Atty. Gen., Roane County, for petitioner, West Virginia State Lottery Comm'n.

Darrell V. McGraw, Jr., Atty. Gen., William S. Steele, Deputy Atty. Gen., Charleston, for respondents.

Reverend James M. Kerr, West Virginia Counsel of Churches, Charleston, amicus curiae.

Scott A. Churilla, Robinson & McElwee, Charleston, for amicus curiae GTech Corp.

Martin J. Gaughan, Weirton, for amicus curiae Racetrack Employees' Union Local 101.

McHUGH, Justice:

In these original proceedings in mandamus, the petitioners, Mountaineer Park, Inc.

## I.

On November 6, 1984, the voters of the State of West Virginia ratified an amendment to article VI, section 36 of the *West Virginia Constitution* to allow the legislature to "authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more other states[.]" Upon receiving voter approval, the legislature enacted the State Lottery Act, *W.Va.Code*, 29–22–1 through 29–22–28, "to establish and implement a state-operated lottery[.]" *W.Va.Code*, 29–22–2 [1985].

The State Lottery Act provides that the lottery is to be operated under the supervision of the Lottery Commission and its director. Under the Act, the Lottery Commission was first authorized to initiate a "pre-printed instant winner type lottery." *W.Va. Code*, 29–22–9(a) [1990]. The Act further provides that the "commission shall proceed with operation of such additional lottery games, including the implementation of games utilizing a variety of existing or future technological advances at the earliest feasible date." *W.Va.Code*, 29–22–9(c) [1990].

Within a year after the enactment of the State Lottery Act, lottery operations began; first with the sale of instant game tickets [1] in January of 1986, and then with the implementation of an "on-line game" [2] the follow-

---

**1.** The "Instant Game" is defined under the State Lottery Rules and Regulations as "[a] game in which a ticket is purchased and upon removal of a latex covering on the front of the ticket, the ticket bearer determines his or her winnings, if any, which are payable upon presentation to the lottery for payment." 179 *West Virginia Code of State Rules* § 1–2.11 (1991). The "Instant Ticket" is defined under the regulations as "[t]he

ticket purchased for participation in an instant game." 179 *W.Va.C.S.R.* § 1–2.12 (1991).

**2.** The "On–Line Game" is defined under the State Lottery Rules and Regulations as

[a] lottery game in which a player pays a fee to a lottery agent and selects a combination of digits, numbers, or symbols, type and amount of play, and drawing date, and receives a com-

ing month. In 1990, the Lottery Commission expanded lottery operations by entering into a three-year contract with Mountaineer for the operation of an electronic video lottery game at Mountaineer's thoroughbred race track in Hancock County, West Virginia. The video lottery terminals, which are provided by Mountaineer under its contract with the Lottery Commission, are owned by Scientific Games, Inc.

In 1993, Senate President Keith Burdette, in response to concerns raised by certain senators regarding the continuation and expansion of electronic video lottery, requested that Attorney General Darrell V. McGraw issue an opinion as to whether private ownership of the video lottery terminals was constitutionally permissible. Attorney General McGraw opined that article VI, section 36 of the *Constitution* requires that the state own all "devices" used in conjunction with the state lottery.

Thereafter, the Lottery Commission and Mountaineer submitted a contract amendment and extension agreement to the director of the Purchasing Division of the Department of Administration for approval. In a letter dated May 21, 1993, Mr. Riley, the director of the purchasing division and a respondent herein, refused to approve the contract amendment and agreement extension based upon the Attorney General's opinion that the video lottery terminals must be owned by the State of West Virginia.

The Lottery Commission and Mountaineer each now seek a writ of mandamus from this Court to compel the respondents to approve their contract amendment and extension agreement on the ground that the *Constitu-tion* does not mandate that the State own the video lottery terminals.

## II.

As an initial matter, we point out that the parties to these mandamus proceedings have focused their arguments on the issue of whether the *West Virginia Constitution* mandates that the State must own each component of electronic video lottery. In our review, however, we have found that the more crucial inquiry is whether the *Constitution* requires the legislature to pass laws which prescribe: (1) the manner in which electronic video lottery operations are regulated, controlled, owned and operated before any can be properly conducted; and (2) sufficient standards to guide the Lottery Commission so that the delegation of authority is constitutional and does not vest the Lottery Commission with uncontrolled discretion.[3]

█ Thus, in reaching our decision today, we are guided by the basic principles governing constitutional construction and interpretation. We succinctly stated these principles in *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973):

The fundamental principle in constitutional construction is that effect must be given to the intent of the framers of such organic law and of the people who ratified and adopted it. . . . If the language of a constitutional provision is plain and unambiguous it is not subject to judicial interpretation, the intent of the framers and the people being readily ascertainable therefrom. When an ambiguity appears, however, ordinary principles employed in statutory construction must be applied to ascertain

puter-generated ticket with those selections printed on it. The lottery will conduct a drawing to determine the winning combination(s) in accordance with the rules of the specific game being played. Each ticket bearer whose valid ticket includes a winning combination shall be entitled to a prize if a claim is submitted within the specified time period. 179 *W.Va.C.S.R.* § 1–2.17 (1991).

**3.** We note that in other cases, this Court has considered questions and matters not raised by the parties. *E.g., State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975) (Court will take cogni-zance of plain error involving a fundamental right of an accused which is protected by the Constitution); *Delardas v. Morgantown Water Comm'n,* 148 W.Va. 318, 134 S.E.2d 889 (1964) (mandamus proceeding where this Court, on appeal, considered a jurisdictional question on its own motion). There have also been cases where this Court deemed it necessary to reformulate certified questions, *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993), and to notice and discuss questions which fairly arise upon the record in a certified case, *Charleston Transit Co. v. Condry,* 140 W.Va. 651, 86 S.E.2d 391 (1955).

such intent. It must, therefore, first be determined whether the constitutional provision in question is imbued with ambiguity.

(citations omitted). Simply put, the object of constitutional construction and interpretation is to give effect to the intent of the people in adopting it. *Diamond v. Parkersburg–Aetna Corp.*, 146 W.Va. 543, 122 S.E.2d 436 (1961); *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953). However, where the provision of the *Constitution* " 'is clear in its terms and of plain interpretation to any ordinary and reasonable mind, it should be applied and not construed.' " Syl. pt. 4, *State ex rel. Casey v. Pauley*, 158 W.Va. 298, 210 S.E.2d 649 (1975); syl. pt. 3, *State ex rel. Smith v. Gore*, 150 W.Va. 71, 143 S.E.2d 791 (1965).

■ Moreover, when, as here, this Court is called upon to either interpret or construe an exception to a constitutional provision, such exception must be "strictly construed and limited to objects fairly within their terms." 16 Am.Jur.2d *Constitutional Law* § 108 p. 452 (1979) (footnote omitted). *See* 16 C.J.S. *Constitutional Law* § 18 p. 67 (1984).

■ Another equally important principle this Court must consider is that the legislature may not vest an administrative agency with uncontrolled discretion.[4] The legislature may not grant an administrative agency unbridled authority under an enabling statute; the delegation of authority to the agency in connection with the administration of statutes must be circumscribed by rules for the guidance of the agency. 16 C.J.S. *Constitutional Law* § 143 (1984). We recognized this fundamental principle of constitu-

tional law in syllabus point 3 of *Quesenberry v. Estep*, 142 W.Va. 426, 95 S.E.2d 832 (1956):

As a general rule the Legislature, in delegating discretionary power to an administrative agency, such as a board or a commission, must prescribe adequate standards expressed in the statute or inherent in its subject matter and such standards must be sufficient to guide such agency in the exercise of the power conferred upon it.

*See State ex rel. West Virginia Housing Development Fund v. Waterhouse*, 158 W.Va. 196, 212, 212 S.E.2d 724, 733 (1974); *State ex rel. West Virginia Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969);[5] *Meisel v. Tri–State Airport Authority*, 135 W.Va. 528, 64 S.E.2d 32 (1951).

■ Finally, an administrative agency can only exercise such powers as those granted by the legislature, and if such agency exceeds its statutory authority, its action may be nullified by this Court. *State Human Rights Comm'n v. Pauley*, 158 W.Va. 495, 212 S.E.2d 77 (1975), *disapproved of on another point, State ex rel. Human Rights Comm'n v. Pearlman Realty Agency*, 161 W.Va. 1, 239 S.E.2d 145 (1977).

Keeping in mind these fundamental principles, we now briefly review the history of the constitutional provision relating to lotteries. At the first constitutional convention of the State of West Virginia, the framers of our state *Constitution* adopted, without debate, a prohibition against lotteries.[6] 1 *Debates and Proceedings of the First Constitutional Convention of West Virginia 1861–1863* pp. 51, 673–74. Article XI, section 1 of the original constitution provided that "[n]o lottery shall be authorized by law; and the buying, selling

---

4. 73 C.J.S. *Public Administrative Law and Procedure* § 27 p. 399 (1983) states:
 The delegation of legislative powers to administrative bodies is limited by the constitution, and, while a limited grant of power circumscribed by proper standards and declarations of legislative policy may be permissible, it is improper for the legislature to delegate its law-making power or vest an agency with uncontrolled discretion.

5. We held in syllabus point 5 of *Copenhaver*: " 'The delegation by the legislature of broad dis-

cretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitutional.' Point 8 Syllabus, *Chapman v. Huntington, West Virginia, Housing Authority*, 121 W.Va. 319 [3 S.E.2d 502 (1939)]."

6. The proposed prohibition against lotteries was included in the report prepared and submitted by the Committee on Fundamental and General Provisions.

or transferring of tickets or chances in any lottery shall be prohibited." 3 *Debates and Proceedings of the First Constitutional Convention of West Virginia 1861–1863* p. 881.[7]

The absolute prohibition against lotteries remained part of our *Constitution* until 1983, when the Senate and the House approved a state-run lottery amendment to be placed on the ballot for voter ratification in the 1984 general election.[8] The proposed amendment was summarized on the ballot as follows: "To amend the State Constitution *to permit the Legislature to pass laws* authorizing state operated and controlled lotteries." [9] (emphasis added). In 1984, the voters ratified this amendment to allow the legislature to pass laws establishing a state-run lottery.

Accordingly, article VI, section 36 of the *West Virginia Constitution* was amended to provide an exception to the prohibition against lotteries. Article VI, section 36 of the *Constitution* now provides, in relevant part:

> *The legislature shall have no power to authorize lotteries* or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State; *except that the legislature may authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more other States.*

(emphasis added). The exception to the prohibition against lotteries created by this constitutional amendment is the center of the controversy in the case now before us.

### A.

### *Video Lottery in Other States*

Legislatures in other states, which have similar constitutional provisions, have enacted specific statutes authorizing video lottery games.[10] A good example is South Dakota. The exception to the prohibition against lotteries under the South Dakota Constitution is substantially the same as the exception

7. One author has explained that lotteries fell out of favor in the 1800's because of "social problems, such as the impact that lotteries had on the morality and work ethic of the people, and fraudulent operation." Ronald J. Rychlak, *Lotteries, Revenues and Social Costs: A Historical Examination of State–Sponsored Gambling,* 34 B.C.L.Rev. 11, 32 (1992).

8. The Senate's proposed version of the state-run lottery amendment provided that "[t]he Legislature shall have the power to authorize state operated lotteries or gift enterprises, and may pass laws regulating and controlling such activities in this state." S.J.Res. 3, *Journal of the Senate,* Regular Session of the 66th Legislature, January 24, 1983, p. 307. The House did not agree with the Senate's version of the constitutional amendment, and proposed certain modifications to the resolution which were initially rejected by the Senate. S.J.Res. 3, *Journal of the Senate,* Regular Session of the 66th Legislature, February 2, 1983, p. 463. The proposed House amendments to the Senate resolution, which were ultimately passed by both Houses of the Legislature, provided that lotteries are prohibited "except that the legislature may authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law, either separately by this State or jointly or in cooperation with one or more other states[.]" S.J.Res. 3, *Journal of the Senate,* Regular Session of the 66th Legislature, February 14, 1983, pp. 641–42.

9. A copy of the ballot from the general election held on November 6, 1984, containing the state lottery amendment, was provided by the Secretary of State's office upon the request of this Court.

10. We note that not all of the handful of states which allow video gambling regulate such gambling under a state lottery act. For example, Montana allows the operation of video gambling machines under the Video Gaming Machine Control Law, Mont.Code Ann. §§ 23–5–602 *et seq.* (Montana's Gambling Statutes), rather than under its state lottery statutes, Mont.Code Ann. §§ 23–7–101 *et seq.*

South Carolina has also enacted the "Video Game Machines Act," S.C.Code Ann. § 12–21–2770 *et seq.* However, S.C.Code Ann. § 12–21–2738 (1993) provides that the

cash payouts authorized by Section 16–19–60 ... relating to coin-operated devices may only be continued in any county in South Carolina after June 30, 1995, if a majority of the qualified electors of the county voting in a statewide referendum at the time of the 1994 general election vote in favor of the continued regulation and issuance of these licenses.

Interestingly enough, article XVII, § 7 of the South Carolina Constitution prohibits all lotteries.

found under our Constitution.[11]

The South Dakota Legislature enacted statutes establishing and regulating video lottery operations. Specifically, the South Dakota Legislature: (1) set forth the requirements for licensed video lottery machines, S.D.Codified Laws Ann. § 42-7A-37 (1991); (2) placed restrictions on licensed establishments, S.D.Codified Laws Ann. § 42-7A-37.1 (Supp.1993); (3) established limits on the amount played and the awards given, S.D.Codified Laws Ann. § 42-7A-38 (1991); (4) required a background investigation of video lottery licensees, S.D.Codified Laws Ann. § 42-7A-43 (Supp.1993); (5) stated the rules for placement of video lottery machines in establishments, S.D.Codified Laws Ann. § 42-7A-44 (Supp.1993); (6) established criminal penalties for tampering with a video lottery machine and manipulating the outcome, payoff or operation of a video lottery machine, S.D.Codified Laws Ann. §§ 42-7A-46 and 42-7A-47 (1991); and (7) established the age limit and legal hours for the operation of video lottery machines, S.D.Codified Laws Ann. § 42-7A-48 (1991).[12]

Similar statutory provisions authorizing video lottery games have been enacted by the Rhode Island General Assembly. The Constitution of Rhode Island provides an exception, comparable to the exceptions found under the Constitutions of South Dakota and West Virginia, to the general prohibition against lotteries.[13] The Rhode Island

General Assembly enacted Chapter 61.2 of Volume 6C of the General Laws of Rhode Island. In addition to setting forth the powers and duties of the Lottery Commission with respect to video lotteries, R.I.Gen.Laws §§ 42-61.2-2 to 42-61.2-4 (Supp.1992), the General Assembly placed restrictions upon whom may play, R.I.Gen.Laws § 42-61.2-5 (Supp.1992), and when video lottery may be played, R.I.Gen.Laws § 42-61.2-6 (Supp. 1992). The General Assembly also specified the allocation of the income derived from video lottery games, R.I.Gen.Laws § 42-61.2-7 (Supp.1992), and established penalties for tampering with or manipulating the outcome, payoff or operation of the video lottery terminal, R.I.Gen.Laws § 42-61.2-8 (Supp. 1992).

As a final example, we recognize the laws established in Oregon for the operation of video lottery.[14] While article XV, section 4 of the Oregon Constitution prohibits the operation of any lottery, it does create certain exceptions, including the operation of a state-run lottery by the Lottery Commission. The Oregon Legislative Assembly authorized the Lottery Commission to initiate games using video lottery devices, Or.Rev.Stat. § 461.215 (1991), placed limitations on the placement of video lottery terminals, Or.Rev.Stat. § 461.-217(2) (1991), and specified the use of proceeds from video lottery games, Or.Rev.Stat. §§ 461.544 to 461.548 (1991).[15] The Oregon Legislative Assembly also enacted compre-

11. Article III, section 25 of the South Dakota Constitution provides, in pertinent part:

The Legislature shall not authorize any game of chance, lottery or gift enterprise, .... However, it shall be lawful for the Legislature *to authorize by law, a state lottery which is regulated, controlled, owned and operated by the state of South Dakota, either separately by this state or jointly or in cooperation with one or more other states.* (emphasis added).

12. We note that these are not all of the laws enacted by the South Dakota Legislature governing the operation of a video lottery game. *See* S.D.Codified Laws Ann. §§ 42-7A-36 through 42-7A-48.

13. Article 6, section 15 of the Rhode Island Constitution provides that "[a]ll lotteries shall be prohibited in the state except lotteries operated by the state and except those previously permit-

ted by the general assembly prior to the adoption of this section, and *all shall be subject to the prescription and regulation of the general assembly.*" (emphasis added).

14. We note that recently, in Oregon, opponents of video gambling brought an action for declaratory and injunctive relief alleging that the statutes authorizing video lottery games violate the state's constitutional prohibition against gambling. *Ecumenical Ministries of Oregon v. Oregon State Lottery Comm'n,* 121 Or.App. 389, 854 P.2d 952 (1993). The Court of Appeals of Oregon held that "video poker," "games using video devices," and "casinos" were "technological in nature," and that the court needed evidentiary presentations. *Id.* at 954.

15. For all of the laws enacted by the Oregon Legislative Assembly pertaining to lottery operations, including video lottery, see Or.Rev.Stat. §§ 461.010 *et seq.*

hensive laws for: (1) the operation of the lottery; (2) lottery game retailers, vendors and contractors; (3) lottery finances; and (4) prohibited conduct. Or.Rev.Stat. §§ 461.200 to 461.600 (1991).

## B.

### The Legislature

■ As in every case involving the application or interpretation of a constitutional provision, analysis must begin with the language of the constitutional provision itself. Upon analyzing the exception created under article VI, section 36 of the *Constitution,* we believe this constitutional provision " 'is clear in its terms and of plain interpretation to any ordinary and reasonable mind[.]' " Syl. pt. 4, *Casey, supra;* syl. pt. 3, *Smith, supra.* By its terms, article VI, section 36 of the *Constitution* allows the legislature to authorize lotteries which are regulated, controlled, owned and operated by this state *"in the manner provided by general law* [.]" (emphasis added). The plain language of this constitutional provision authorizes the legislature not simply to establish a state-run lottery, but also to prescribe the "general law" pursuant to which the lotteries will be "regulated, controlled, owned and operated[.]"

Moreover, we believe that the application of the plain language of article VI, section 36 of the *Constitution* gives effect to the intent of the people in adopting it. Specifically, the voters of this state, in ratifying the amendment, authorized the legislature to "pass laws" establishing a state-run lottery. The unambiguous terms of this constitutional provision allowing lotteries to be "regulated, controlled, owned and operated ... in the manner provided by general law" clearly gives effect to the intent of the voters of this

state to allow the legislature to "pass laws" authorizing a state operated and controlled lottery.

With respect to electronic video lottery, however, the legislature has *not* enacted the appropriate laws establishing electronic video lottery games.[16] In fact, the only specific reference to electronic video lottery under our State Lottery Act is found under *W.Va. Code,* 29-22-9(b)(2) [1990], which provides that "[e]lectronic video lottery systems must *include a central site system of monitoring* the lottery terminals utilizing an on-line or dial-up inquiry." [17]

Electronic video lottery, by its very nature, is significantly different from common state-run lottery games. Although this Court has not been given a specific description of the devices to be used in video lottery, we have found descriptions of such devices from other sources. For example, a commentator has noted that the "video lottery terminals" used at Mountaineer Park are "converted *slot machines* that can dispense paper-tickets." Cory Aronovitz, *To Start, Press the Flashing Button: The Legalization of Video Gambling Devices* 5 Software L.J. 771 n. 1 (1992) (emphasis added). Furthermore, one state defines "video lottery machines" as "any electronic video game machine that, upon insertion of cash, is available to play or simulate the play of a video game, including but not limited to video poker, keno and blackjack[.]" S.D.Codified Laws Ann. § 42-7A-1(18) (Supp.1993). Another state defines "video lottery terminals" as "any electronic computerized video game machine that, upon the insertion of cash, is available to play a video game ... which uses a video display and microprocessors in which, by chance, the player may receive free games or credits that can be redeemed for cash." R.I.Gen.Laws § 42-61.2-1(a) (Supp.1992). *See also*

---

16. Interestingly, the initiation of the video lottery game without an act of the legislature was recently noted by one scholar who observed that "West Virginia put in [video lottery terminals] without an act of the Legislature; the state lottery commission simply decided the [video lottery terminals] were legally lotteries." I. Nelson Rose, *Gambling and the Law—Update 1993,* 15 Hastings Comm. & Ent.L.J. 93, 102 n. 56 (1993).

17. We note that the legislature also enacted a vague statutory provision allowing the Lottery

Commission to "proceed with operation of such additional lottery games, including the implementation of games utilizing a variety of existing or future technological advances at the earliest feasible date." *W.Va.Code,* 29-22-9(c). The legislature also provided that the Lottery Commission could operate lottery games using "electronic computers and electronic computer terminal devices and systems[.]" *W.Va.Code,* 29-22-9(c) [1990].

S.C.Code Ann. § 12–21–2772(5) (1993). Our legislature, however, has yet to even define electronic video lottery, much less explicitly authorize it. Such definition and authorization is essential where, as in this state, there has been a long-standing general prohibition against gambling of any kind.

The fact that electronic video lottery is different from the common state-run lottery games, and has been defined as "video poker, keno and blackjack," also raises a question as to whether electronic video lottery is actually a lottery [18] as contemplated by *W.Va. Const.* art. VI, § 36.[19] West Virginia law prohibits gambling, *W.Va.Code,* 61–10–1 to 61–10–31. For example, *W.Va.Code,* 61–10–1 [1970] prohibits any person from keeping or exhibiting a "gaming table, ... or faro bank, or keno table, or any slot machine, multiple coin console machine, multiple coin console slot machine or device in the nature of a slot machine, or any other gaming table or device of like kind[.]" [20] It is not clear from the record

before us whether video lottery is the type of gambling prohibited under our anti-gambling statutes. We are not convinced that *W.Va. Const.* art. VI, § 36 contemplated a form of lottery which in some states has included gambling activities such as slot machines and keno. Moreover, we cannot find that the State Lottery Act, which neither defines nor explicitly authorizes "electronic video lottery," constitutes a considered judgment by the legislature to implement such a far-reaching scheme to raise revenue. We are simply unwilling to approve, on this record, the Lottery Commission's attempt to bring "electronic video lottery" within the definition of lottery, as that term is used both under the State Lottery Act and *W.Va. Const.* art. VI, § 36.

## C.

### The Lottery Commission

This Court is also troubled by the Lottery Commission's expansion of lottery

---

18. For example, as we previously noted, article XVII, § 7 of the South Carolina Constitution prohibits lotteries. Yet, under the "Video Game Machines Act," an "electronic video games machine that, upon insertion of cash, is available to play ... games ... in which the player may receive free games or credits that can be redeemed for cash" is statutorily-authorized. S.C.Code Ann. § 12–21–2772(5) (1993).

19. In older cases decided by this Court before the exception allowing state-run lotteries under *W.Va. Const.* art. VI, § 36 was adopted, we recognized that "[t]he word 'lottery' is commonly understood to mean 'a scheme for the distribution of prizes by chance.'" Syl. pt. 1, *State v. Matthews,* 117 W.Va. 97, 184 S.E. 665 (1936). We set forth the elements of a lottery in syllabus point 4 of *State v. Hudson,* 128 W.Va. 655, 37 S.E.2d 553 (1946): "The essential elements of a lottery are consideration, prize and chance; and any scheme or device, by which a person, for a consideration, is permitted to receive a prize or nothing, as may be determined predominantly by chance, is a lottery."

However, at the time the definition of lotteries was stated in *Hudson,* lotteries were looked upon with more disfavor than most other forms of gambling: "In general lotteries are judicially condemned as particularly vicious in comparison with other forms of gambling because of their public nature and the contaminating and unwholesome influence which they produce in a community in which they flourish." 128 W.Va. at 665, 37 S.E.2d at 558–59. The Hudson court recognized that even a punch board was considered a lottery. *Id.*

However, since electronic video lottery did not exist at the time of the *Matthews* and *Hudson* decisions, these earlier definitions of a lottery offer us little guidance with respect to electronic video lottery.

*W.Va.Code,* 61–10–11 [1939], which sets forth the penalty for operating a lottery, was enacted to meet the requirements of *W.Va. Const.* art. VI, § 36, which formerly prohibited all lotteries. *State v. Greater Huntington Theatre Corp.,* 133 W.Va. 252, 55 S.E.2d 681 (1949). This statute has not been amended by the legislature since the amendment to *W.Va. Const.* art. VI, § 36 was approved.

20. Video poker is one example of the type of gambling we have recently found to be prohibited under *W.Va.Code,* 61–10–1 [1970]. We held in syllabus point 2 of *United States v. Dobkin,* 188 W.Va. 209, 423 S.E.2d 612 (1992) that "[i]t is gambling prohibited by *W.Va.Code,* 61–10–1 [1970] to use a video poker machine that does not disburse money directly but is equipped with a free play feature when the player is reimbursed in money or any other thing of value except free plays for accumulated free plays."

While we held that video poker was prohibited under *W.Va.Code,* 61–10–1 [1970], we also held that the use of video poker machines for gambling purposes is not prohibited by *W.Va.Code,* 61–10–11 [1939], the statutory provision which sets forth the penalty for setting up a lottery or raffle, because the Court found that video poker machines "have no relation whatsoever to a lottery or raffle." *Id.* at 212, 423 S.E.2d at 615.

operations to include electronic video lottery at Mountaineer Park. The Lottery Commission cannot act without constitutional and statutory authority.[21] There is no language in article VI, § 36 of our *Constitution* which would give the Lottery Commission the authority to establish video lottery.

 As we pointed out earlier in this opinion, the legislature must prescribe adequate standards to guide administrative agencies in the exercise of their power under enabling statutes in order for the delegation of authority to be constitutional. *Waterhouse, supra; Copenhaver, supra; Quesenberry, supra; Meisel, supra.* This simply means, in the case now before us, that the legislature cannot vest the Lottery Commission with unbridled or uncontrolled authority in connection with the administration of the State Lottery Act. While *W.Va.Code,* 29–22–9(b)(2) [1990] authorizes the Lottery Commission to promulgate rules and regulations with regard to "electronic video lottery systems," this provision is clearly not an adequate standard, with respect to electronic video lottery, for guidance of the Lottery Commission in the exercise of its delegated authority under the State Lottery Act.

 Moreover, while the State Lottery Act gives the Lottery Commission the authority to "[s]elect the type and number of public gaming systems or games," *W.Va. Code,* 29–22–5(a)(3) [1985], and to implement "games utilizing electronic computers and electronic computer terminal devices and systems," *W.Va.Code,* 29–22–9(c) [1990], we do not believe that the term "games" as used in these subsections can mean the video gambling devices which are contemplated at Mountaineer Park. This is particularly true in light of the language in both *W.Va.Code,* 29–22–9(b)(4) [1990], which states that "[n]o lottery utilizing a machine may use machines which dispense coins or currency[,]" and *W.Va.Code,* 29–22–9(b)(5) [1990], which states that "[s]election of a winner must be predict-

ed totally on chance." In view of these restrictions and the lack of any clear statement in *W.Va.Code,* 29–22–1, *et seq.* authorizing video gambling devices, we find that the legislature has not delegated such authority to the Lottery Commission. The legislature in subsequent legislation could, of course, amend this statute to clearly state that video gambling devices are part of the lottery system.

To interpret *W.Va.Code,* 29–22–5(a)(3) [1985] and *W.Va.Code,* 29–22–9(c) [1990], as giving the Lottery Commission unbridled authority to select and implement any game, including those not contemplated by the *Constitution* and the legislature, would raise serious constitutional questions regarding the enabling statute. As we recognized in syllabus point 1 of *Perilli v. Board of Education,* 182 W.Va. 261, 387 S.E.2d 315 (1989): "'Wherever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will be adopted by the courts.' Syllabus Point 3, *Slack v. Jacob,* 8 W.Va. 612 (1875)."

 Thus, this Court must construe both *W.Va.Code,* 29–22–5(a)(3) [1985] and *W.Va.Code,* 29–22–9(c) [1990], as allowing the Lottery Commission to select those common state-run lottery games which were included in a lawful delegation of authority by the legislature, and which can be operated in accordance with the exception created under *W.Va. Const.* art. VI, § 36. Thus, because the legislature has not enacted general laws for the regulation, control, ownership and operation of electronic video lottery, and because the legislature failed to prescribe adequate standards in the State Lottery Act to guide the Lottery Commission in the exercise of the power conferred upon it with respect to electronic video lottery, the Lottery Commission was without authority under the

---

21. An administrative agency may not, under the guise of regulation, issue a rule or regulation which enlarges its statutory authority. *Ney v. State Workmen's Compensation Comm'r,* 171 W.Va. 13, 297 S.E.2d 212 (1982); *Rowe v. West Virginia Dep't of Corrections,* 170 W.Va. 230, 292 S.E.2d 650 (1982); 1 Am.Jur.2d *Administrative Law* § 132 p. 944 (1962) (Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which extends or enlarges the act being administered).

*Constitution* to establish electronic video lottery.

 In summary, we conclude that article VI, section 36 of the *West Virginia Constitution* provides an exception to the prohibition against lotteries to allow the operation of a lottery which is regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law. Only those lottery operations which are regulated, controlled, owned and operated in the manner provided by general laws enacted by the West Virginia legislature can be properly conducted in accordance with the exception created under article VI, section 36 of our *Constitution.*[22]

We further hold that in order for a delegation of authority by the legislature to an administrative agency to be constitutional, the legislature must prescribe adequate statutory standards to guide the agency in the administration of the statute, and not grant the agency unbridled authority in the exercise of the power conferred upon it. A general delegation of authority by the legislature to the Lottery Commission under *W.Va.Code*, 29–22–9(b)(2) [1990], authorizing it to promulgate rules with regard to "electronic video lottery systems," is clearly not a sufficient statutory standard which would vest the Lottery Commission with power to include electronic gaming devices, such as electronic video lottery, as part of the operations of the state lottery. To hold otherwise would result in an unlawful delegation of legislative power to the Lottery Commission and would violate article VI, § 36 of the *West Virginia Constitution.*

### III.

The traditional rule governing the issuance of a writ of mandamus has been consistently stated by this Court:

'A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of

respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.' *Syllabus* point 2, *State ex rel. Kucera v. Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). Syl. pt. 4, *Delardas v. County Court of Monongalia County*, 158 W.Va. 1027, 217 S.E.2d 75 (1975).

Based upon our holding in this case, we find that the petitioners are not clearly entitled to the relief sought. Accordingly, the petitions for writs of mandamus are denied.

Writs denied.

---

While we recognize that the voters, upon ratifying the amendment to article VI, section 36 of the *West Virginia Constitution,* authorized the legislature to pass laws establishing a state-run lottery, we question whether the voters were approving video lottery operations. There is nothing in the record before us which indicates that electronic video lottery was contemplated or even existed at the time voters approved the lottery amendment in 1984.